The NEXXUS PRODUCTS CO., R.G. Shakour, Inc., and Lords & Lady's Hair Salon, Inc. Plaintiffs

v.

CVS NEW YORK, INC., CVS Pharmacy, Inc., and Quality King Distributors, Inc. Defendants

No. CIV. A. 97–40197–PBS.

United States District Court, D. Massachusetts.

July 8, 1999.

following responses to discovery: (1) answer to interrogatory and production of documents from The Nexxus Products Company ("Nexxus") in response to its first set of interrogatories and requests for production (Docket No. 37); (2) various answers to interrogatories and production of documents from each of the Plaintiffs in response to its second set of interrogatories and requests for production and third set of interrogatories (Docket No. 77); and (3) production of documents viewed by Quality King's counsel at the Shakour facility in Westborough, Massachusetts, and designated for copying at that time (Docket No. 76). Quality King has also moved the Court to impose sanctions on the Plaintiffs pursuant to Fed.R.Civ.P. 37 & 26(g) for knowing failure to produce certain requested discovery. For the following reasons, Quality King's Motion to Compel Discovery by the Nexxus Products Co. (Docket No. 37) is DENIED; its Second Motion to Compel Discovery Responses by the Plaintiffs (Docket No. 77) is ALLOWED in part and DENIED in part; its Motion to Compel Documents from Shakour (Docket No. 76) is DENIED; and its Motion for Sanctions (Docket No. 83) is DENIED.

Michael P. Angelini, Vincent F. O'Rourke, Jr., Bowditch & Dewey, Worcester, MA, for Plaintiffs.

Steven M. Cowley, Brian H. Lamkin, Edwards & Angell, William R. Grimm, Robert Millen, Hinckley, Allen & Snyder, Boston, MA, for Defendants.

### ORDER ON DEFENDANTS' MOTIONS TO COMPEL DISCOVERY, AND DEFENDANTS' MOTION FOR SANCTIONS

ALEXANDER, United States Magistrate Judge.

Defendant Quality King Distributors, Inc. ("Quality King") has moved to compel the

### I. Factual Background

Nexxus is a manufacturer and seller of hair care products. Nexxus alleges that it has a policy of selling its products exclusively to beauty salons, beauty schools, and hair care professionals. Nexxus avers that it does not permit its distributors to sell its products to retail stores, such as drug stores and department stores. Nexxus claims that Quality King has been obtaining Nexxus products and reselling the products to unauthorized retailers, such as CVS, who in turn market the products to its retail customers, a process known in the industry as "diversion."[1] Nexxus also claims that Defendants have been defacing the coding labels on its hair care products.

---

1. *See Matrix Essentials, Inc. v. Cosmetic Gallery, Inc.*, 870 F.Supp. 1237, 1241 (D.N.J.1994) ("Because of the good reputation of many salon-only products ... general non-salon retailers (beauty supply stores, drug stores, and the like) try to obtain supplies of these products. The process by which retailers obtain salon-only merchandise for resale at retail is known as 'diversion' and those engaged in the operation are known as diverters. Because of the profit potential to

Plaintiffs have raised five claims in their Second Amended Complaint (Docket No. 97)[2]: (1) trademark infringement under section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); (2) trademark dilution under the Federal Trademark Dilution Act, section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); unfair trade practices under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); making false and misleading statements also in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A. Defendants have raised the affirmative defenses of laches and estoppel, and have counterclaimed for abuse of process and for unfair trade practices under Mass. Gen. Laws ch. 93A.

■ Plaintiffs seek injunctive relief to enjoin the Defendants from engaging in their allegedly prohibited conduct. Plaintiffs also seek costs and attorneys fees for the violation of the Lanham Act, and costs and fees under 93A. Relevant to this Court's evaluation of the pending discovery motions is the standard for obtaining a permanent injunction: (1) Plaintiffs must prevail on the merits; (2) Plaintiffs must show that in the absence of injunctive relief, they would suffer irreparable injury; (3) Plaintiffs must show that the harm to them would outweigh the harm the Defendants would suffer from the imposition of an injunction; and (4) Plaintiffs must show that the public interest would not be adversely affected by the issuance of an injunction. See A.W. Chesterton Co., Inc. v. Chesterton, 128 F.3d 1, 5 (1st Cir.1997) (citing Indian Motorcycle Assoc. III Ltd. Part-nership v. Mass. Housing Fin. Agency, 66 F.3d 1246, 1249 (1st Cir.1995)).

A Brobdingnagian mass of discovery is involved in the instant disputes, and much of the tempest swirls around the issue of what constitutes the permissible scope of discovery in this litigation. Specifically, this Court must resolve the question of whether or not the Defendants may access materials relevant to determining if the Plaintiffs sustained any actual damages or suffered any demonstrable harm to reputation as a result of the Defendants' alleged diversion of Nexxus products. As a general rule, a defendant is entitled to discover that which the plaintiff must prove to prevail on his or her claims. Similarly, parties are entitled to discover information relevant to a defendant's defenses and counterclaims. Under Fed.R.Civ.P. 26(b), such information may be sought by parties regardless of its admissibility at trial if it appears reasonably calculated to lead to the discovery of admissible evidence. Accordingly, to accurately limn the scope of discovery, this Court must undertake a review of the elements of the parties' claims and defenses.

## II. The Scope of Discovery Does Not Include Discovery Related to Proving or Disproving the Existence of Actual Harm to Plaintiffs

### A. Trademark Infringement

■ To prevail on the trademark infringement claim, Plaintiffs must show that Nexxus has a valid, protectable mark, and that the Defendants' use of the mark in commerce is likely to cause confusion among consumers. See 15 U.S.C. § 1114(1)(a).[3] Trademark protection is a one trick pony-that is, trademark

---

those who participate in diversion, it is a wide spread phenomenon. The attitude of manufacturers who purport to be salon-only sellers varies. Some seem to tolerate or even encourage the practice because it builds sales, others discourage the practice but do not take strong affirmative action to stop it, while others ... actively fight diversion. Diversion of salon-only products can occur primarily in three ways. First, a wholesale distributor can sell to persons other than salons; second, salons can resell parts of their inventory to retailers; and third, persons known as 'collectors' can purchase small quantities of product at numerous salons (with or without salon connivance) and resell them to retailers.").

2. In their Second Amended Complaint, Plaintiffs have dropped all claims for the money damages originally sought in their First Amended Complaint, filed in the United States District Court for the District of Massachusetts on October 27, 1997, upon removal from Worcester Superior Court.

3. The statute states in relevant part: "(1) Any person who shall, without the consent of the registrant-(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause

rights are exhausted as to a given item on the first sale of that item. *See* J. McCarthy, McCarthy on Trademarks § 25.11[1] at 25–61 (3rd ed.1994). Therefore, as a general rule, trademark law does not apply to the resale of genuine goods bearing a true mark, even if the sale is without the mark owner's consent. *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.,* 988 F.2d 587, 590 (5th Cir.1993).

■ In the case of resale of damaged goods, however, "trademark infringement may occur if 'there exists a material difference between the products sufficient to create a likelihood of consumer confusion.'" *Matrix Essentials v. Cosmetic Gallery,* 870 F.Supp. 1237, 1251 (D.N.J.1994) (citing *John Paul Mitchell Sys. v. Pete–N–Larry's Inc.,* 862 F.Supp. 1020, 1023 (W.D.N.Y.1994)); *see also Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.,* 982 F.2d 633, 640 (1st Cir.1992) (in a gray market goods case involving import, without consent, of mark holder's product into country where mark holder sold a higher quality version of the product bearing the same mark, the Court wrote: "liability [on claims under section 32(1)(a), 42 and 43(a) of the Lanham Act] necessarily turns on the existence *vel non* of material differences between the products of a sort likely to create consumer confusion.").

■ Similarly, a distributor's failure to observe a restrictive condition on a sale of a product can only constitute trademark infringement if the trademark owner can prove consumer confusion, "the hallmark of any trademark infringement claim." *Polymer Technology Corp. v. Mimran,* 37 F.3d 74, 79 (2nd Cir.1994).

### B. Unfair Trade Practices & False and Misleading Statements Under the Lanham Act

■ The likelihood of consumer confusion is the focus of Plaintiffs' claims under section 43(a) alleging unfair trade practices and false and misleading statements as well. *See* 15 U.S.C. § 1125(a)[4]; *Casa Helvetia,* 982 F.2d at 640; *Boston Athletic Ass'n v. Sullivan,* 867 F.2d 22, 29 (1st Cir.1989); *Maple Grove Farms of Vermont, Inc. v. Euro–Can Products, Inc.,* 974 F.Supp. 85, 95 (D.Mass.1997); *accord Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.,* 43 F.3d 922, 930 (4th Cir.1995). To prevail on these claims, Plaintiffs must demonstrate that Defendants have used their mark in a manner which is likely to cause confusion or to deceive consumers as to the source of the goods.

■ If Plaintiffs are successful in establishing that Defendants have infringed their valid mark, Plaintiffs need not establish irreparable harm for purposes of obtaining injunctive relief-"irreparable harm flows from an unlawful trademark infringement as a matter of law." *Casa Helvetia,* 982 F.2d at 640[5]; *see also Lone Star,* 43 F.3d at 938; *Camel Hair and Cashmere Institute of America, Inc., v. Associated Dry Goods Corp.,* 799 F.2d 6, 14–15 (1st Cir.1986); *Processed Plastic Co. v. Warner Communications, Inc.,* 675 F.2d 852, 858 (7th Cir.1982).

### C. Trademark Dilution Under the Federal Trademark Dilution Act ("FTDA"), Section 43(c) of the Lanham Act

■ A successful plaintiff in a dilution action must demonstrate that (1) the contested

mistake, or to deceive; ... shall be liable in a civil action by the registrant for the remedies hereinafter provided." 15 U.S.C. § 1114(1)(a).

**4.** The statute states in relevant part: "(1) any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or

commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services or commercial activities shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act."

**5.** The First Circuit in *Casa Helvetia* explained, "[b]y its very nature, trademark infringement results in irreparable harm because the attendant loss of profits, goodwill, and reputation cannot be satisfactorily quantified and, thus, the trademark owner cannot be adequately compensated." 982 F.2d at 640.

mark is famous and distinctive; (2) the defendant is making commercial use of the mark; (3) the use began after the mark became famous, and (4) the use causes dilution of the distinctive quality of the mark. *See* 15 U.S.C. § 1125(c) [6]; *I.P. Lund Trading v. Kohler Co.*, 163 F.3d 27, 35 (1st Cir.1998).

■ The overriding purpose of anti-dilution statutes is to prohibit a merchant of non-competitive goods from selling its products by trading on the goodwill and reputation of another's mark. *See L.L.Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 30 (1st Cir. 1987), *cert. denied*, 483 U.S. 1013, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987). "The dilution injury 'is the gradual whittling away or dispersion of the identity and hold upon the public mind of the mark or name by its use on non-competing goods.'" *Id.* (quoting Schecter, The Rational Basis of Trademark Protection, 40 Harv. L.Rev. 813, 825 (1927)). It is well established that anti-dilution statutes "have developed to fill a void left by the failure of trademark infringement law to curb unauthorized use of marks where there is no likelihood of confusion between the original use and the infringing use." *Id.* Congress acted in 1995 to further fill this void by enacting the FTDA to provide uniform national protection against dilution, and to bring U.S. law into conformity with international agreements. *See* H.R.Rep. No. 104–374, at 3–4 (1995), *reprinted in* 1995 U.S.C.C.A.N. 1029, 1030–31.

Dilution laws "are intended to address specific harms; they are not intended to serve as mere fallback protection for trademark owners unable to prove trademark infringement." *Kohler*, 163 F.3d at 48. While dilution protection is typically extended to non-competing uses of a mark, the FTDA recognizes that dilution may occur where, even absent some consumer confusion, a competitor's use of a mark blurs or tarnishes a senior mark. *See id.*

There are eight non-exclusive statutory factors a court may consider in determining if a mark is distinctive and famous. *See* 15 U.S.C. § 1125(c).[7] A plaintiff in a dilution action has a high hurdle to clear to demonstrate that a mark is truly famous and distinctive. The standard for fame and distinctiveness required under the FTDA is more rigorous than that required to seek infringement protection. *See Kohler* 163 F.3d at 46–47. A showing that a mark is nationally renown is an important factor in determining whether a mark is famous for purposes of the FTDA. *See id.* ("The Trademark Review Commission noted that the showing of fame required employment of a 'higher standard' than fame among an 'appreciable number of persons' in order to be 'eligible for this extraordinary remedy.'" (citation omitted) One commentator has referred to this category of famous marks as "Supermark[s]." (citation omitted)).

■ Proof of dilution can be made by showing either blurring or tarnishing of the mark. *See Kohler*, 163 F.3d at 47. Tarnishing occurs when a consumer's capacity to associate the mark with the appropriate products or services has been diminished. *See L.L.Bean*, 811 F.2d at 31. The *L.L.Bean* court noted that "[t]he threat of tarnishment arises when the goodwill and reputation of a plaintiff's trademark is linked to products which are of a shoddy quality or which conjure associations that clash with the associa-

6. The FTDA states in relevant part: "the owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection." 15 U.S.C. § 1125(c).

7. The factors are: "(A) the degree of inherent or acquired distinctiveness of the mark; (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used; (C) the duration and extent of advertising and publicity of the mark; (D) the geographical extent of the trading area in which the mark is used; (E) the channels of trade for the goods or services with which the mark is used; (F) the degree of recognition of the mark in the trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought; (G) the nature and extent of use of the same or similar marks by third parties; and (H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register." 15 U.S.C. § 1125(c)(1)(A)-(H).

tions generated with the lawful use of the mark." *Id.* The associations conjured-in other words, consumer perception of the mark-plays a central role in determining if a mark has been tarnished. *See Tiffany & Co. v. Boston Club, Inc.* 231 F.Supp. 836, 844 (D.Mass.1964).

A determination that blurring has occurred turns on the question of whether target customers are likely to view the products as essentially the same. *See Kohler,* 163 F.3d at 50 (citation omitted). As with tarnishment, "[b]lurring occurs in the minds of potential customers." *Kohler,* 163 F.3d at 50–51. Consumer perception, therefore, is a key element in establishing a dilution claim. The *Kohler* court explicitly rejected lessening of demand as the standard by which a plaintiff must demonstrate blurring-"blurring has to do with the identification of a product, and that is not the same thing as a lessening of demand." *Id.* at 49. Proof of actual harm to the Plaintiffs, is, therefore, not necessary to establish a dilution claim.

\

### D.  93A

To prevail on their claim for attorneys' fees and costs under 93A, Plaintiffs would need to make a showing that Defendants' alleged diversion caused confusion among consumers. *See, e.g., Star Financial Services, Inc. v. Aastar Mortgage Corp.,* 89 F.3d 5, 14 (1st Cir.1996) (award of attorneys' fees under 93A to plaintiff in servicemark infringement case proper where injunction issued prohibiting defendant from further infringing use even in light of jury finding that plaintiff had sustained no actual damages); *Kazmaier v. Wooten,* 761 F.2d 46, 51 (1st

Cir.1985) (holding that defendants had not violated chapter 93A as no deception could result in absence of consumer confusion); *R.J. Toomey Co. v. Toomey,* 683 F.Supp. 873, 879 (D.Mass.1988) (finding 93A violation, where Lanham Act violation was established, predicated on finding of likelihood of consumer confusion and absent showing of actual harm).

Plaintiffs, therefore, need not make a showing of actual harm in order to obtain injunctive relief for the conduct alleged in the complaint. *See Aktiebolaget Electrolux v. Armatron, Int'l,* 999 F.2d 1, 5 (1st Cir.1993) ("We have found a clear distinction between the showing required to establish a right to injunctive relief and that required to establish a right to damages." (citation omitted)).

### E.   Laches & Estoppel

Defendants have raised the affirmative defenses of both laches and estoppel. To prevail on its defense, Defendants need to establish that (1) Plaintiffs had knowledge of Defendants' use of the mark; (2) Plaintiffs inexcusably delayed in taking action with respect to this use; and (3) Defendants will be prejudiced by allowing the Plaintiffs to assert their rights at this time. *See McCarthy, supra,* at § 31:1. Demonstrating the likelihood of consumer confusion also plays a key role in determining the viability of Defendants' laches and estoppel defenses.[8] Due to the strong public interest in preventing consumer confusion, courts have granted injunctive relief to mark owners, notwithstanding the owner's lack of diligence in pursuing his or her rights. *See Conagra v. Singleton,* 743 F.2d 1508, 1517 (11th Cir.1984); McCarthy, *supra,* at § 31:6 ("[B]ecause of the overriding interest of the public in being free from

8. There is substantial confusion regarding the definition of these terms in the case law. Commentators have noted that "Properly speaking, 'laches' consists of the trademark owner's unreasonable delay plus prejudice to the accused infringer. Laches will bar some remedies, such as an accounting for profits, but not necessarily others, such as an injunction. An 'estoppel' arises when the owner represents, explicitly or by conduct that he will not enforce his rights and the accused infringer relies on that representation[]. A true estoppel usually bars all relief." Donald S. Chisum & Michael A. Jacobs, Understanding Intellectual Property Law § 5F[2][e]

(1992). Discussing the interrelationship between delay, prejudice and estoppel, McCarthy offers this useful "rule of thumb": "Estoppel by laches = delay × prejudice. In this formula, it is the magnitude of the product of delay and prejudice which must be weighed. For example, in one case, a long delay coupled with a small amount of prejudicial reliance may suffice to prove an adequate defense of estoppel by laches. Yet, in another case, a short delay coupled with a great amount of prejudicial reliance by defendant may also suffice for a defense." McCarthy, *supra,* at § 31:2.

confusion and mistake as to source or affiliation, the defense of estoppel by laches is only rarely applied to bar a permanent injunction after a strong case of likely confusion has been proven."). Requests for information reasonably calculated to lead to the discovery of admissible evidence related to this defense are permissible.

### F. Counterclaim for Abuse of Process and 93A Violation

To prove their claim for abuse of process, Defendants contend that they are entitled to obtain discovery related to the issue of Plaintiffs' actual harm, despite the fact that Plaintiffs are no longer seeking money damages, so that they may demonstrate that Plaintiffs lacked a good faith basis for initially alleging that they had suffered actual harm. (Defs.' Memo. in Support of Second Motion to Compel at 6, Docket No. 78.)

This argument lacks merit. The Court accepts the representations Plaintiffs have made to the Court: namely, that they jettisoned their claims for money damages in order to avoid discovery related to their financial records. (Opp. Of Shakour Inc. to Defs.' Motion to Compel Production of Documents at 2, Docket No. 84.) If the Defendants questioned the candor and doubted the good faith basis of the allegations in the Plaintiff's First Amended Complaint, other avenues of relief have long been available to them. *See, e.g.*, Fed.R.Civ.P. 11. The counterclaim endures in response to the Plaintiffs' remaining claims should the Defendants uncover some evidence to support their allegations of the Plaintiffs' nefarious motives for suing the Defendants.

To sum, the Defendants need not discover any information that would allow them to refute a claim that Plaintiffs have sustained actual damages, or allow them to demonstrate the existence of causal factors other then their alleged conduct that might be responsible for any actual harm to Plaintiffs. Plaintiffs took the issue of actual harm off the table when, in their Second Amended Complaint, they dropped their request for an award of damages. The proper scope of discovery in this litigation does not include discovery of information relevant to either proving or disproving the existence of actual harm to Plaintiffs.

■ The Court has determined, based on the Defendants' representations, that the following interrogatories and requests for productions of documents were served on one or more of the Plaintiffs for the purpose of obtaining information that would enable Defendants to either refute a claim that Plaintiffs sustained actual harm, or to demonstrate the existence of causal factors other than their alleged conduct that would be responsible for any actual harm to Plaintiffs:

*From Docket No. 37:*

1. Interrogatory No. 9 to Nexxus

2. Request for Production No. 8 to Nexxus

*From Docket No. 78*

3. Request for Production No. 59 to Nexxus

4. Request for Production No. 61 to Nexxus, except as to part (iv)

5. Request for Production No. 66 to Nexxus

6. Request for Production No. 75 to Nexxus

7. Request for Production No. 51 to Shakour

8. Request for Production No. 52 to Shakour

9. Request for Production No. 53 to Shakour

10. Request for Production No. 54 to Shakour

11. Request for Production No. 55 to Shakour

12. Request for Production No. 56 to Shakour

13. Request for Production No. 58 to Shakour

14. Request for Production No. 59 to Shakour

15. Interrogatory No. 19 to Lord's and Lady's

16. Request for Production No. 41 to Lord's & Lady's

17. Request for Production No. 56 to Nexxus

18. Request for Production No. 57 to Shakour

19. Request for Production No. 44 to Lord's & Lady's

Accordingly, Defendants' Motion to Compel production of these documents and answers is DENIED. As to the following interrogatories and requests, the Defendants' motion is ALLOWED as this Court has determined the requests to be reasonably related to either proof of the Plaintiffs' remaining claims, or proof of the Defendants' affirmative defenses, and thus within the permissible scope of discovery under Fed.R.Civ.P. 26:

*From Docket No. 77*

1. Request for Production No. 60 to Nexxus

2. Request for Production No. 60 to Shakour

3. Request for Production No. 43 to Lord's & Lady's

4. Request for Production No. 63 to Nexxus

5. Interrogatory No. 25 to Nexxus

6. Interrogatory No. 26 to Nexxus

7. Request for Production No. 62 to Nexxus

8. Request for Production No. 65 to Nexxus

9. Request for Production No. 69 to Nexxus

10. Request for Production No. 70 to Nexxus

11. Request for Production No. 63 to Shakour

12. Request for Production No. 67 to Shakour

13. Interrogatory No. 21 to Lord's & Lady's, to the extent that Lord's & Lady's shall describe any other related entities bearing the same name.

14. Interrogatory No. 23 to Lord's & Lady's

15. Interrogatory No. 24 to Lord's & Lady's

With regard to Request for Production No. 57 to Nexxus and Request for Production No. 49 to Shakour, the parties are referred to this Court's Order dated June 22, 1999, that resolved the issues of required disclosure of materials reviewed by experts pursuant to Fed.R.Civ.P. 26(a)(2)(B) & (b)(4)(A).

### III. Defendants May Not Compel Production of Documents Inspected and Designated for Copying Where No Prejudice to Defendants Will Result from Non-Disclosure

This body of contested discovery concerns documents made available to Quality King's counsel by Shakour at its Westborough, Massachusetts facility. Some review of the relevant facts is useful. On February 27, 1998, Quality King served its first set of requests for production upon Shakour. This first set of requests solely sought information about Nexxus products. Shakour made the documents available for inspection on August 27, 1998. The volume of discovery was extensive, and some of the responsive documents were contained in bound volumes consisting of largely unresponsive documents. Quality King designated certain documents for copying, and these were produced by Shakour on September 16, 1998. None of the materials were redacted during this inspection, and Shakour avers that it was not practical to redact information from each document in advance of the inspection. Shakour notes in its memorandum "[t]hat this was the proper decision was confirmed when Quality King designated documents for copying and production: none of the financial documents was designated for copying." (Opp. Of Shakour at 2, Docket No. 84.)

A few months later, Quality King requested to inspect the documents again in relation to its first set of requests. Additionally, Quality King served upon Shakour a second set of requests on January 26, 1999. Shakour made the documents available for re-inspection on February 11, 1999. Shakour represents that its counsel explicitly stated on several occasions that the documents were being provided for re-inspection exclusively in response to Quality King's *first* set of requests. (*Id.*) (Emphasis supplied.) Upon re-inspection, Quality King designated for copying certain financial data it had passed

over on its first inspection. Shakour responded to Quality King's second set of requests on March 5, 1999. Shakour has produced some of the documents designated for copying during Quality King's re-inspection with redactions, and provided Quality King with a log of those withheld and redacted documents. Quality King is not seeking production of any documents reflected in the log for which Plaintiffs are asserting attorney-client and/or work product privilege. (Defs.' Memo in Support of Motion to Compel at 7 n.1, Docket No. 75.)

Quality King raises four arguments in support of its position that it is entitled to receive the documents designated for copying without redaction: (1) the documents are relevant to determining whether Shakour has sustained harm—"an essential component of Shakour's claim for injunctive relief"—(Defs.' Memo. at 4, Docket No. 75); (2) the documents were already produced, so any objection to producing them has been waived; (3) some of the documents were reviewed by the Plaintiffs' expert, and so must be disclosed under Fed.R.Civ.P. 26(a)(2) & (b)(4); and (4) the documents are relevant to Quality King's counterclaim for abuse of process.

Shakour contends that the documents exceed the scope of discovery now that the Plaintiffs have narrowed their claims and seek only injunctive relief, and that the documents Quality King is now seeking are not responsive to its first set of requests.

Fed.R.Civ.P. 34 states in relevant part:

"(a) Scope. Any party may serve on any other party a request (1) to produce and permit the party making the request, or someone acting on the requester's behalf, to inspect and copy, any designated documents ... or to inspect and copy, test, or sample any tangible things which constitute or contain matters within the scope of Rule 26(b) and which are in the possession, custody or control of the party upon whom the request is served; ... (b) Procedure. The request shall set forth, either by individual item or by category, the items to be inspected and describe each with reasonable particularity.... The response shall state, with respect to each item or category, that inspection and related activities will be permitted as requested, unless the request is objected to, in which event the reasons for the objection shall be stated. If objection is made to part of an item or category, the part shall be specified and inspection permitted of the remaining parts.... A party who produces documents for inspection shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request."

Neither party's actions can be said to represent a model of compliance with the requirements of the Rule. Quality King's requests occupy the outer limits of the definition of description "with reasonable particularity." Shakour, on the other hand, likely could have undertaken a more thorough review and organization of its documents prior to the inspections. Shakour probably would have benefitted from implementing an "attorneys eyes only agreement" like the one instituted by Quality King when Plaintiffs' counsel inspected its documents. (Quality King's Reply at 3–4, Docket No. 92.) Although the level of precaution exercised by Shakour cannot be said to be unreasonable under these particular circumstances, Shakour could have taken steps to prevent the inadvertent disclosure of the documents at issue.

The Court has reviewed the Plaintiffs' Log of Documents Withheld from Production (Defs.' Memo. at Att. E). Despite the fact that the documents were produced for inspection to Defendants, the Court finds that, for the following reasons, the Defendants will not be prejudiced by denial of access to the documents. *Cf. Milford Power Ltd. Partnership v. New England Power Co.,* 896 F.Supp. 53 (D.Mass.1995). First, for the reasons discussed previously, Defendants are not entitled to discovery of any documents requested on the basis of their relevance to proving or disproving the existence of actual harm to Plaintiffs. Second, Defendants were given access to the documents for re-inspection in order to obtain information relevant to their first set of requests. In the interest of fairness, they may not, therefore obtain documents that are not responsive to the

first set of discovery requests served on Shakour. Third, the parties are referred to this Court's Order dated June 22, 1999, that resolved the issue of required disclosures of material reviewed by experts. Finally, as discussed earlier, this Court finds that the Defendants' argument with regard to relevance premised upon its counterclaim for abuse of process lacks merit.

In light of the Court's Order today, and its Order of June 22, 1999, these materials are not discoverable. It makes no difference then if Defendants have already viewed them or designated them for copying. No prejudice will befall Defendants by precluding them from obtaining documents which are not now discoverable.

### IV.. Sanctions Are Not Available

■ Quality King has moved this Court, pursuant to Fed.R.Civ.P. 37(b)(2)(B), for sanctions against the Plaintiffs that would preclude the Plaintiffs from presenting any evidence regarding Defendants' alleged tampering with the product codes and warranties on Nexxus's products and its impact on the Plaintiffs' trademarks, goodwill and/or sales. As grounds, they aver that the Plaintiffs withheld from them discovery relevant to test the veracity of Nexxus's claim that (1) it is necessary for customers of Nexxus products to receive salon advice and instruction at point of purchase, and (2) customers must be able to read the warranty label on each product to ensure that they will understand that the product is only warranted if sold through a salon. (Defs.' Memo. in Support of Sanctions at 8, Docket No. 83.) The Defendants also seek sanctions pursuant to Fed.R.Civ.P. 26(g).

The Defendants recently became aware of a 1999 Massachusetts Appeals Court decision in the matter of *Lord's & Lady's Enterprises v. John Paul Mitchell Systems*, 46 Mass.App. Ct. 262, 705 N.E.2d 302 (1999), an action instituted in 1993 that concerned a dispute over John Paul Mitchell System's ("JPMS") alleged agreement to advertise its products in a catalog to be published by Lord's & Lady's. The Court's opinion notes that Nexxus also agreed to have its products offered through the catalog. The Plaintiffs did not provide the Defendants with any information regarding the catalog or catalog sales prior to Defendants' receipt of notice of the publication of the Appeals Court's decision.

Upon Defendants' request, Plaintiffs provided letters from Steve Redding, president of Nexxus, to Michael Barsamian, president of Lord's & Lady's, dated May 17, 1991 and July 23, 1991 (Defs.' Memo. at Att. C), that confirm that Redding did agree to grant permission to Lord's & Lady's to advertise Nexxus products in its customer catalog, on the condition that the catalog distribution be limited to customers of Lord's & Lady's. To ensure compliance with the restriction, Nexxus requested that Lord's & Lady's keep computer records of its sales for Nexxus so that it could confirm that Nexxus New England Products would not be distributed in the exclusive territories of other distributors. (*Id.*)

The agreement between Nexxus and Lord's & Lady's was short lived as the catalog was discontinued sometime in 1992, and it appears that only one test mailing occurred. Defendants argue that the Plaintiffs' failure to produce evidence of the catalog sooner constitutes deliberate concealment of evidence and that Plaintiffs' failure to disclose information regarding the catalog illustrates "Plaintiffs' demonstrated willingness to lie." (Defs.' Memo at 11, Docket No. 83.)

The Plaintiffs contend that the omission was inadvertent, and that as soon as the omission was brought to their attention by the Defendants, Lord's & Lady's produced all relevant information in its possession, including the litigation files from the JPMS case. (Plaintiffs' Memo. in Opposition at 4; Barsamian Aff.) The Plaintiffs further contend that neither Shakour nor Nexxus have retained any materials related to the catalog. (Albert Aff.; Redding Aff.; Shakour Aff.) The Plaintiffs argue that, as a matter of law, sanctions are not available as they have not violated a discovery order entered by this Court.

The Plaintiffs are correct. Fed.R.Civ.P. 37(b)(2)(B) states in relevant part:

"(b) Failure to Comply With Order

(2) Sanctions by a Court in Which Action is Pending

If a party ... fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule ... the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following: ...

(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence."

The First Circuit has held that Rule 37's language requires two "conditions precedent to engaging the gears of the rule's sanction machinery," first, a court order must be in effect, and second, that order must be violated. *R.W. International Corp. v. Welch Foods Inc.*, 937 F.2d 11, 15 (1st Cir.1991) ("The taxonomy of Rule 37 is progressive. If an order to answer is issued under Rule 37(a), and then disobeyed, Rule 37(b)(2) comes into play, authorizing the trial court to impose further sanctions, including the ultimate sanction of dismissal."). Here, there was no discovery order in place that the Plaintiffs violated. Sanctions are, therefore, unavailable. Moreover, once the Defendants made the Plaintiffs aware of the omission, the Plaintiffs supplied all related documents in their control and custody. This is not a situation where the failure of discovery has been absolute. *See id.* at 17.

█ Nor does this Court find any violation of Fed.R.Civ.P. 26(g) that would entitle the Defendants to relief pursuant to 26(g)(3). 26(g), the "Rule 11" of discovery, requires that an attorney certify, through his or her signature upon every discovery disclosure, that to the best of the signer's knowledge, formed after reasonable inquiry, the disclosure is complete and correct. *See* Fed. R.Civ.P. 26(g)(1). If a certification is made in violation of the Rule without substantial justification, the Court must impose sanctions upon the attorney making the certification. *See* 26(g)(3).

Here, Nexxus provided the terms for its agreement to Lord's & Lady's proposal eight years ago. The entire project lasted approximately one year, and resulted in approximately one by a firm other than the firm currently representing Lord's & Lady's in the instant action. Barsamian deposed that he did not know that his counsel in the JPMS matter still possessed documents concerning the catalog, and that he believed the documents had been destroyed since the litigation had terminated.

The case *sub judice* has involved a copious amount of discovery. An inadvertent omission of this nature, in the context of a voluminous, multi-party discovery process, quickly remedied upon identification, is not the sort of conduct the Rule seeks to deter. There is not even a scintilla here to indicate that the Plaintiffs' discovery disclosure certifications were made in contravention of Rule 26.

Accordingly, Defendants' motion for sanctions under Rules 26 and 37 is DENIED.